United State District Court
District of Connecticut

SCANNED at
and Emailed
12/28/23 by MB . 63 pages
date    initials   No.

Plaintiff

Tyrick Thomas

V

Defendant's.

1) The Department of Corrections
2) Angel Quiros
3) Nick Rodriguez                Case No. _____
4) Warden: Reis
5) Warden: Guadarrama
6) Captain: Ramos
7) Lieutenant: Carey
8) Lieutenant: Venoutsos
9) Nurse: Jane Doe              Date: 12/28/2023
10) mental Health worker: Jane Doe
11) Correctional Officer: White

(This is a 1983 Civil suit filed In Propia persona)

(Jurisdiction)

1) This Court has Jurisdiction over the plaintiff's Claim's of Violation's of federal Constitutional Right's under 42 U.S.C. §§ 1331(1) and 1343

2) This Court also has supplemental Jurisdiction over the Plaintiff's state law tort's & Claim's under 28 U.S.C. §§ 1367

1 of __

(Introduction)

This is a civil rights action filed by the Plaintiff
_____, a State Prisoner for relief
Name
under 42 U.S.C. § 1983, for allegation of 8th Amendment
violation of the U.S.C., 14th Amendment violation of the U.S.C.,
failure to Act, failure to Protect, Spoliation of
Evidence, Perjuryed Statement, supervisory Liablity,
failure to adequately train, excessive use of force,
violation of the American with Disabilities Act, violation
of section 504 of the Rehabilitation Act, violation of the
Prisoner Rape Elimination Act-PREA

(Plaintiff)

Name: _Tyrek Thomp_
address: Cheshire, Corr, Inst
         900 Highland Ave
         Cheshire, C.T. 06410


(Defendant's)

Defendant #1
1) Name: The Department of Corrections
   Title: State Agent
   address: 24 Wolcott Hill Road
            Wethersfield, C.T. 06109


                                    2 of

(Defendant's)

Defendant #2

2) Name: Anggel Quiros
   Title: ~~District Administrator~~ Commissioner
   address: The Department of Correction
            24 Wolcott Hill Road
            Wethersfield, C.T. 06109

Defendant #3

3) Name: Nick Rodriguez
   Title: District Administrator
   address: The Department of Correction
   ~~Defendant #~~ 24 Wolcott Hill Road
            Wethersfield, C.T. 06109

Defendant #4

4) Name: Reis
   Title: Warden
   address: The Department of Correction
            24 Wolcott Hill Road
            Wethersfield, C.T. 06109

Defendant #5

5) Name: Guadarrama
   Title: Warden
   address: The Department of Correction
            24 Wolcott Hill Road
            Wethersfield, C.T. 06109

3 of

(Defendant's)

Defendant #6
6) Name: Ramos
Title: Captain
address: The Department of Correction
        24 Wolcott Hill Road
        Wethersfield, C.T. 06109

Defendant #7
7) Name: Carey
Title: Lieutenant
address: The Department of Correction
        24 Wolcott Hill Road
        Wethersfield, C.T. 06109

Defendant #8
8) Name: Venoutsos
Title: Lieutenant
address: The Department of Correction
        24 Wolcott Hill Road
        Wethersfield, C.T. 06109

Defendant #9
9) Name: Jane Doe
Title: Nurse
address: The Department of Correction
        24 Wolcott Hill Road
        Wethersfield, C.T. 06109

4 of

(Defendant's)

Defendants #10

10) Name: Jane Doe
Title: mental Health Staff
address: The Department of Correction
24 Wolcott Hill Road
Wethersfield, C.T. 06109


Defendant #11

11) Name: White
Title: Correctional Officer
address: The Department of Correction
24 Wolcott Hill Road
Wethersfield, C.T. 06109


I, ✗ _____, declare under penalty of
perjury that the foregoing is true and Correct to the
best of my knowledge as follows in the Plaintiff's
Statement of Facts

Note: All Named parties in this
Statement of facts are
being suid in their (Official-
Capacity) and (Individual-
Capacity)

5 of __

(Statement of facts)

1) On (7/6/2023) I was approach by "Captain: Ramos" for a Targetted Cell search.

2) The Protocal for a Targetted Cell Search in order to Preserve Evidence, is to Record the Search with a hand held Camera, to Preserve the Plaintiff's 4th Amendment U.SC. Right's, and to Insure the Preservation of any allege Evidence Claimed to be found or Seen this was vidated

3) As (C/o White) and (Captain: Ramos) approached my Cell I was blowing my nose with toilet paper.

4) As the Cell Door open, I was throw the toilet paper in the toilet and sitting up to see what was happening and started to stand up as my cell Door was opening while throwing to Toilet paper in the Toilet.

5) As I throw the Toilet paper away (Captain: Ramos) Rushed me from just inside my cell Doorway.

6) (Captain: Ramos) then Proceeded to choke me, by Putting me in a Rear Naked Choke hold



6 of

(Statement of facts)

7) This rear Naked Choke hold with many other's have been outlawed by the (Goege Flyd Act) across every State in the United States, after the world saw the Deadly out Come of Such Choke hold on national Headline's and across the world

8) While Choking me from behind (Captain: Ramos) Start Kicking the back's of my calf's forceful Knocking to the Ground.

9) Where (Captain: Ramos) Proceeded to (Grab me) by my Genital's and Proceeded to Squeeze and Twist my Genital's Sexual assaulting me, while beating me across the face With closed fist's Instead of Fore-Fist's as trained, which amount to excessive force and Sexual assault

10) During this Sexaul assault and Attack on my Person, I screamed out in pain repeatedly begging for him to Let me go.

11) During this sexual assault & Attack by (Captain: Ramos) (Correctional Officer: White) and Multiple Unknown other's Joined in the Beating Punching and Beating me

7 of

(Statement of Facts)

12) This beating Continued even after I was secured in hand cuffs and Defenseless and poised no threat

13) At this point (Lieutenant: Carey) unnecessarily Deployed chemical Agent Less than Inches from my face and Proceeded to spray my body unnecessarily when I presented no threat.

14) I was then extremely and roughly Dragged to my Feet while I yell in pain, Letting all (D.O.C.-Personnel) know that I am a Disabled Individual under the American with Disabilities Act, and Walk with the Aid of a Cane.

15) (D.O.C.-Personnel) Ignored these Pleas and extremely and roughly and painfully Slammed me against the Wall Causing me to yell out in pain

16) Where I was Immediately Sprayed with chemical agent unnecessarily again by (Lieutenant: Carey) malicously.

17) I was then Placed in Segregation under a false Disciplenary Report, Given by (captain: Ramos) Issued to Deliberately Cover up his Acts of Violation of my Constitutional Rights

8 of

(Statement of facts)

18) And then Systemicly Retaliated against by
Both (D.O.C. Personnel) and (mental Health-
Staffing Jane Doe or John Doe) by being placed
on a (Behavior Observation Status/B.O.S.)) in
order to Inflict Psycalogical torment and torture
Deliberately as have become the Practice and
use of Behavior Observation Status within
the Department of Corrections to Inflict
mental and emotional torment and torture

19) The Contradictions is While I was told, I was on
a (Behavior Observation Status) I Retained a
Segregation uniform and was also on (Incell-
Restraints) unnecessarily

20) Their acts of Deliberate Indifferance are
clear as, I was Denied to report the sexual
assault for #3 Days of the Incident date of
(7/6/2023)

21) On (7/9/2023) under extreme mental and emotional
torment I told (mental Health Staff: John Doe)
of the sexual assault and beating I recieved

9 of

(Statement of facts)

22) I was Immediately sent to the U-Conn emergency center.

23) Where I reported the sexaul assault to the State police.

24) And also under went multiple test, that Proved I recieved Injury to my Genital's as, The Doctor told me, my Genital's are Swollen at the time on (7/9/2023)

25) And was prescribed Pain medication and Ice-compresses to bring down the Swelling

End of Statement

Sign: _____

Date: 12/28/2023

10 of

(Cause of Action #1)

This claim is Brought against all Name Defendants for the Violation Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); failure to Provide Reasonable accommodations for Person's with Physical disabilities and mental Disabilities, violation of the American with Disabilities Act

The excessive use of force on the Plaintiff While Noted by (D.O.C.) as Physically disabled Individual by Providing the Plaintiff with a Cane to Walk assert's Violation's of Section 504 of the Rehabilitation Act. And (D.O.C.) receives federal grant's, Contract's, and other financial assistance thereby subjecting itself to the requirement's of Section 504. 29 U.S.C. § 794(a).

Therefore (D.O.C.) is Legally responsible for Section 504 violation's commited by (D.O.C.) staff and Contractor's who Provide Program's, Services, or Activities, including but not Limited to medical and mental Health services, to (D.O.C.) Prisoner's, therefore (D.O.C.) fails to reasonably modify it's Policies, Practices, and Procedures assigning Prisoner's who are Physically Disabled and mentally Disabled Prisoner to Segregation to In-Cell Restraint's shackling and behavior Observation Status (B.O.S.)

11 of

(Cause of Action #2)

(42 U.S.C. § 1983: Eighth and Fourteenth Amendments as Stated in Statement of Fact Page #6 through #10)

This claim is Brought against all Named defendants in their official Capacity as all Named Defendants Acted under color of State law at all times relevant hereto in this Connection with all the events described herein to include the Disciplenary Actions take by Defendants to Deliberadely hide the Chain of events, to Include but not Limited to the Disciplenary Appeal Process, Disciplenary Hearing, Appeal of the Plaintiffs Disciplenary Process by all **Named** Defendants and their agents, officials, employees, and Others acting in Concert with them under color of State law by and Pursuant to (D.O.C.)'s Policy, Custom, and Practice to subject the Plaintiff and the Prison Population to degrading mistreatment, to Cause Serious pain and Injury, to Place Said Plaintiff & the Prison population in substantial risk of of Serious physical and psychological injury acting in Contrary to Standard's of decency, all named Defendants and their agents, officials, employees and Others acting in Concert with them under color of State law, by and pursuant to (D.O.C.)'s policy, Custom, and Practice to dangerous and Degrading mistreatment, to Cause Serious pain and Injury to substantial risk of serious physical and Psychological torment

Sign: ⟨signature⟩ Date: 12/28/2023  12 of

Exhibit # 1

Front and Back
Disciplenary Report



# Disciplinary Report
## Connecticut Department of Correction

CN 9503/1
REV 10/01/19

| Facility/Unit: Osborn CI | Report date: 7/6/23 |
|---|---|
| Inmate name: Thomas, Tyrick Tashawan | Inmate number: 344007 |

| Housing unit: C-31 Cell | Location of incident: C-Block | |
|---|---|---|
| Report number: | Incident date: 7/6/23 | Incident time: 6:40   ☐ am  ☒ pm |

| Offense: Assault on Doc Employee | Offense class:  ☒ A  ☐ B  ☐ C |
|---|---|

**Description of violation:** At approximately 6:40pm, Officer West and I approached the target cell and signal to the unit officer to open 31 cell. Once cell 31 door was opened, I entered the cell and position myself in front of the toilet. I noticed inmate Thomas sitting on the bottom bunk and inmate Smith lying down on the top bunk I gave both inmates verbal commands to stay on their beds which they did at the time and follow my verbal commands. At this time, I instructed inmate Thomas to get up and turn towards the cell door and walk towards officer West so he could be patted down. After giving inmate Thomas the verbal command to get up, he reached for and unidentified item in his locker it appeared to be three small squares and charged this reporting writer in attempt to flush what he had in his hand. I Captain Ramos gave inmate Thomas verbal commands to stop pushing towards this writer and let go of my hand and drop the items that were in his right hand on the floor and get on the ground, which he did not comply with, inmate Thomas, continued to ignore all verbal commands given to him. This reporting writer instructed Officer West to call a coded Orange due to the fact I was unable to reach for my radio microphone while attempting to keep inmate Thomas from striking this writer and pushing me towards the toilet. Inmate Thomas was able to get passed this reporting writer and flush the items at this time, I continued to give inmate Thomas verbal commands to stop resisting and comply with my direction to get off this writer which he did not comply.

| Witness(es): |
|---|

| Physical evidence: |
|---|

| Reporting employee (print): Ramos | | Title: Captain |
|---|---|---|
| Reporting employee (signature): | | |

| Date: 7/6/23 | Time: 8:30   ☐ am  ☒ pm | Employee requests copy:  ☒ yes  ☐ no |
|---|---|---|

### CUSTODY SUPERVISOR / UNIT MANAGER REVIEW

| ☒ Administrative Detention | Date: 7/7/23 | Time: 4:15  ☒ am  ☐ pm |
|---|---|---|
| ☐ Accused inmate interviewed | ☐ Informal disposition | |

Custody Supervisor / Unit Manager name (print): Venoutsos

Custody Supervisor / Unit Manager signature:

| Title: Lieutenant | Date: 7/7/23 | Time: 4:25  ☒ am  ☐ pm |
|---|---|---|

### INMATE NOTICE

| Delivered by (print): Cossidy | Delivered by (signature): |
|---|---|

| Title: C/O | Date: 7-7-23 | Time: 5:00  ☒ am  ☐ pm |
|---|---|---|

| | ○ Check if inmate receiving disciplinary report is placed on a Behavioral or Mental Health Observation Status. |
|---|---|
| | ○ If applicable, delivering officer must read the Disciplinary Report to the inmate and leave the copy at the Officers Station. |
| ☐ | ○ Once a qualified mental health provider deems that the inmate can retain paper, the Disciplinary Report shall be issued to the inmate in accordance with this directive. |
| | ○ Note: Timeframes associated with the disciplinary process for inmates initially placed on Behavioral or ~~Mental Health~~ Status shall not be altered and will continue as outlined in this directive. |



# Disciplinary Report
## Connecticut Department of Correction

CN 9503/2
REV 10/01/19

| Investigator: | Receipt date: | Time: | ☐ am ☐ pm |
|---|---|---|---|

**Attempt, accessory and conspiracy:** When supported by the evidence, the offenses of attempt, accessory and conspiracy shall be deemed to be included in the substantive offense without having to be separately charged. Attempt, accessory and conspiracy shall be punishable in the same degree as if the substantive offense were committed.

## CLASS A OFFENSES

Alteration of a specimen
Arson
Assault
Assault on a DOC employee
Bribery
Contraband (dangerous instrument, escape item, unauthorized currency, drug and/or tobacco, drug and/or tobacco paraphernalia, intoxicating substance, tattoo equipment, wireless communication device or component)
Creating a disturbance
Destruction of property ($100 or more)

Escape
Escape from PCS Supervision
Falsely Reporting an Incident
Felonious misconduct
Fighting
Flagrant disobedience
Hostage holding
Hostage holding of a DOC employee
Impeding order
Interfering with safety or security
Intoxication
Possession of Sexually Explicit Materials

Public Indecency
Refusal or Removal Of an Institutional Program or Policy
Refusal to give a specimen
Refusing Housing
Riot (declaration by DOC Commissioner)
Secreting identity
Security Risk Group Affiliation
Security tampering
Self-mutilation
Sexual misconduct
Theft ($100 or more)
Threats
Violation of Program Provisions

## CLASS B OFFENSES

Bartering
Causing a disruption
Contraband (unauthorized items, items in excess of authorized amounts.

Destruction of property (under $100)
Disobeying a direct order
Gambling
Giving false information

Insulting language or behavior
Misdemeanant misconduct
Out of place
Theft (under $100)

## CLASS C OFFENSES

Disorderly conduct          Lingering          Sanitary/housing violation          Violation of unit rules

### Waiver of 24-hour Notice

I hereby waive my right to a 24-hour notice of hearing, and request that a hearing be held at the earliest convenience of the hearing officer.

| Inmate signature: | Date: |
|---|---|
| Witness signature: | Date: |

### Waiver of Appearance

I hereby waive my appearance at the disciplinary hearing.  This does not constitute a guilty plea.

| Inmate signature: | Date: |
|---|---|
| Witness signature: | Date: |

### Guilty Plea

I hereby plead guilty to the charge contained in this disciplinary report. I voluntarily enter this plea and understand that my plea bars an appeal.

| Inmate signature: | Date: |
|---|---|
| Investigator/hearing officer signature: | Date: |

### Deferral of prosecution

| ☐ Prosecution deferred by Disciplinary Coordinator | Through date: |
|---|---|
| Disciplinary Coordinator signature: | Date: |
| Inmate signature: | Date: |

# Exhibit #2

Front and Back
Disciplenary Process
Summary



## Disciplinary Process Summary Report
### Connecticut Department of Correction

CN 9504/2
Rev 10/01/19

Basis for finding: Inmate Thomas #344007 received a class "A" disciplinary report for Assault on a DOC employee. Inmate Thomas was advised of the hearing process; he declined advisor services and identified one inmate witness. Inmate Thomas plead not guilty at the hearing in his defense he stated, "The cells are so small I put my knee brace on which he let me do and I turned my back to throw something that I had in my hand away and he grabbed me in a chokehold stepping on the back of my calf and pulled me down to the ground I didn't strike him or raise my hand, how was I trying to strike him if I had something in my hand". "There is no room in the cell for me to do any of that when he was in the cell he grabbed my genitalia and squeezed it to try and get me to drop what was in my hand I tried to report this and they said there is no way to prove it". "I spoke to mental health because my genitals were swollen I wanted to report what happened , I spoke to a Lieutenant and the lieutenant said it's not PREA but I'm in pain and I'm suffering I went to UConn and did all kinds of testing and they found swelling in my genitals and give me pain meds and an ice pack". "At no point in time did I put my hands on him or push towards him he stood in the doorway and never came all the way in the cell I was facing the locker there was no room for me to even lay on top of this guy they told me to raise my hands I couldn't even move I was yelling I'm not resisting but I couldn't even put my knees up". "I have 7 months till I EOS for me to put my hands on DOC is crazy I wouldn't do any stupid shit like this everyone is under the thumb of this powerful man that runs this facility of course all of the staff members are going to come together and say this is what happened". All evidence was reviewed at the hearing, Inmate Thomas was found guilty at the hearing based on the facility investigation and evidence submitted. Two additional staff members were witnesses to Inmate Thomas assaulting Captain Ramos. Inmate Thomas was advised of the appeal process. Sanctions and penalties imposed.

Basis for sanctions:

To enforce administrative directive 9.5 and to deter future misconduct

### DISPOSING OFFICER

| | | |
|---|---|---|
| Hearing officer signature: Lt. Borkowski | | Date: 07/12/23 |
| Disciplinary coordinator signature: N/A | | Date: N/A |
| Investigator signature: C/O Jagiello | | Date: 07/12/23 |

### INMATE NOTICE

You may appeal a finding of guilty by a hearing officer within 15 days.

| | | |
|---|---|---|
| Delivering officer signature: C/O Jagiello | | Date: 07/12/23 |

Copies (5):  investigator, reporting employee, inmate, disciplinary file and inmate master file



# Disciplinary Process Summary Report
## Connecticut Department of Correction

CN 9504/1
Rev 10/01/19

| | | |
|---|---|---|
| Facility/Unit:  Osborn CI | | Housing unit:  F-7 |
| Report date:  07/06/2023 | Report number:  OCI-2307010 | Hearing date:  07/12/2023 |
| Inmate name:  Thomas, Tyrick Tashawn | | Inmate number:  344007 |
| Reporting employee:  Captain Ramos | | DHO:  Lt. Borkowski |
| Investigator:  C/O Jagiello | | Advisor:  Declined |

| Inmate appearance: | ☒ yes   ☐ no | Reason: N/A |
|---|---|---|

☐ Suspended sentence

| ☐ Deferred prosecution | Number of days | Through:  N/A |
|---|---|---|
| ☐ Charge dismissed | By: N/A | Reason: N/A |

Continuances (dates and reasons):

N/A

SANCTIONS:

15 P/S

90 LOT

90 LOC

60 RREC

## SUMMARY

| | Charge/class | Plea | Finding | |
|---|---|---|---|---|
| Original | Assault on a DOC Employee/ A | NG | Guilty | Forfeiture of Risk Reduction Earned Credits: |
| Substitute | | | | ☐ -10   ☐ -15   ☐ - 25 |
| ☐ Confidential information | Reliability: | | | ☒ - 60   ☐ - _____ |

| Documentation submitted: | ☐ Incident report | ☐ Medical incident report |
|---|---|---|
| | ☐ Use of force report | ☐ Other (specify) |

| Witness name:   Smith #386047 | appearance ☐ yes  ☒ no |
|---|---|

Testimony:  See CN9511

| Witness name:   N/A | appearance ☐ yes  ☐ no |
|---|---|

Testimony:  N/A

| Witness name:   N/A | appearance ☐ yes  ☐ no |
|---|---|

Testimony:  N/A

| ☐ Witness exclusion | Name: | Reason: |
|---|---|---|

Physical evidence, written testimony:

Exhibit #3

Appeal of Administrative
Decision

Front and Back

| **CONFIDENTIAL**<br>(FOR OFFICIAL USE ONLY) | Inmate name: Tyrick Thomas | |
| --- | --- | --- |
| | Inmate number: 344007 | Housing: R.H.U/F-7 |

## SECTION 4: STATE THE PROBLEM AND REQUESTED RESOLUTION

- Provide any factual information that is applicable, including any responses from staff.
- State the action that you think should be taken to resolve the problem.
- PLEASE PRINT.

On 7-6-23 (Capt. Ramos) and (C/o White) came to my cell (31-C Block) at Osborn C.I. to Conduct a Shake down And Random urine By said (Capt.Ramos) He steed in said door way of cell 31 with (C/o white) Behind him. (Capt Ramos) gave verbal commands as to what he wanted us to do for said Procedure. At this time I'm sitting on my Bunk wich is the Bottom Bunk. As said capt and officer were at door of Cell, I reached in locker to grab Knee brace and Put it on which I was allowed to do so. At This time proceeded to wipe my nose and Toss the tissue in Trash/Toilet wich is located to my Left. As said officers are Located to my right. If you go back to the block cameras you can see both officers at door. Once I steed to face toilet and discard tissue I was Rushed from behing and grab in choke hold And Kicked in the Calf to be brought down to the ground. When I buckled and hit said locker, Officer (Ramos) Reached around and grabbeD my genitals and privates which he begin to Squeeze and Twist, I yelled out in Pain and said I'm not Resisting, which he continued to squeeze until I was on the ground. Once cuffed I was mased on grown and mased agin once taken out of the cell. DO to multiple C/o's being called and Camera's the assult on me was not Witnessed, other than my Cellmate. Then another (LT. Carey) who showed up to this code also lied and stated He saw me on top of Said officer (Ramos). It was multiple officers that showed Befor said (LT.Carey) I would like cameras and statements from these officers as well. Please Run Back all Cameras & video footage to see who arrived first. They also denied my Prea claim for 2 days until I spoke with mental health and He (Bill) made the complaint. Not until then was I able to speak to state Police. Also be mindful when investigating this no Police were Called for this attack that so called happen. Which I asked to be called and was told there is no cameras! your word aginst ours.

| Inmate signature: Tyrick Thomas | Date: 7/12/23 |
| --- | --- |

- Deposit this form in the "Administrative Remedies" box.

## SECTION 5: DECISION / OFFICIAL USE ONLY – DO NOT WRITE IN THE SPACE BELOW

| Date Received: 7-20-23 | |
| --- | --- |
| Disposition: denied | Date of Disposition: 7-27-23 |

Reason:

SEE   ATTACHED   DISPOSITION   LETTER

☑ This decision is not subject to further appeal.

| Print Name: Rodriguez | Title: DA |
| --- | --- |
| Signature: | Date: 7-27-23 |



# Appeal of Administrative Decision
## Connecticut Department of Correction

CN 9606
REV
06/28/2021

| Facility/Unit: Osborn C.I. | Date: 7/12/23 |
|---|---|
| Inmate name: Tyrick T Thomas | Inmate number: 344007 |

| SECTION 1: Select One (1) Appeal of Administrative Decision. |
|---|

**I am filing an Appeal of a (select one below):** *(Appeals must be filed within 15 days of notification of a decision.)*

| | | | |
|---|---|---|---|
| ☒ Disciplinary Action | | > | **Complete Section 3 below** |
| ☐ Special Management Decision | ☐ Classification Decision | > | |
| ☐ Rejection of Publication | ☐ Rejection of Correspondence | > | **Complete Section 4 on reverse side** |
| ☐ Security Risk Group Designation | ☐ ADA Decision | > | |
| ☐ Determination of Grievance Process Abuse | ☐ Rejection of Outside Tapes/CDs | > | |

| SECTION 2: INMATE ADVISEMENT |
|---|

- Any inmate who files an Appeal of Administrative Decision must follow all instructions in Section 5 and 7 of Administrative Directive 9.6, "Inmate Administrative Remedies".
- Any Appeal of Administrative Decision which does not follow the instructions identified in the above mentioned sections will be rejected.

| SECTION 3: DISCIPLINARY SECTION – Complete this Section for a Disciplinary Appeal ONLY |
|---|

- You may file a Disciplinary Appeal **ONLY** if you have pleaded not guilty and have been found guilty at a disciplinary hearing.
- If so, complete this section; then complete Section 4 on the reverse side. >>>

| Offense: Assult on DOC Employee | Report date: 7/6/23 |
|---|---|
| Facility where hearing was conducted: Osborn C.I. | Date of hearing: 7/12/23 |

| Did you have an advisor? ☐ yes ☒ no | if yes, name of advisor: |
|---|---|

| Did you identify witness (es) to the investigator? ☒ yes ☐ no | Did your witness (es) testify? ☐ yes ☒ no |
|---|---|

Name(s) of any witness(es): Mark Smith #386047

Exhibit #4

Restrictive housing/
Special management Unit
Status order

# 1 Page



# Restrictive Housing/Special Management Unit Status Order
### Connecticut Department of Correction

CN 9401/1
REV 4/21/23

| Facility/Unit: | Osborn CI | | |
|---|---|---|---|
| Inmate name: | Thomas, Tyrick Tashawan | Inmate number: | 344007 |

## SECTION 1 - STATUS

**Placement in Restrictive Housing Unit (check and date the appropriate description).**

| | | |
|---|---|---|
| ☐ | Transfer Detention | Date: |
| ☒ | Administrative Detention | Date:   7/6/23 |
| ☐ | Punitive Segregation | Date: |
| ☐ | Special Management: | Date: |

## SECTION 2 - REASON FOR PLACEMENT

The inmate's/my continued presence in the general population poses a serious threat to life, property, self, other inmates, and/or the security of the facility because: On July 6, 2023 inmate Thomas # 344007 was placed in restrictive housing on administrative detention pending investigation for Class A disciplinary report for Assault on Doc.

## SECTION 3 – Vulnerable Population Review

Does this inmate meet any of the following criteria? ☐ Yes (if yes, next business day review is required) ☐ No

Under the age of 18 – Over the age of 65 – MH Score 4 or 5 – Has a developmental disability – Significant auditory or visual impairment – Pregnant or Postpartum – Has a serious medical condition in accordance with AD 9.7

| Supervisor signature: | | Date:   7/6/23 |
|---|---|---|
| Inmate given copy of this form:   Time:   5:00   ☒ am   ☐ pm | | Date:   7/7/23 |

# Exhibit #5

#1-Page

## Response to D.R.
### Appeal




# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### District 1 Administrator's Office
#### 1153 East Street South
#### Suffield, Connecticut 06080

**Nick Rodriguez**
**District Administrator**

July 27, 2023

Thomas, Tyrick #344007
Cheshire CI
900 Highland Ave
Cheshire, CT. 06410

Mr. Thomas:

*An extensive review was conducted on your request for a Disciplinary Hearing Appeal for report OCI-2023-04-031, dated July 6, 2023 on the Class (A) offense "Assault on a DOC Employee."*

*The Hearing Officer's finding was reasonable based on information and evidence presented at a formal hearing. Documentation submitted to the presiding Hearing Officer substantiates that on July 6, 2023 you assaulted Capt. Ramos at Osborn CI. Review of documentation to include the incident report and camera footage, it depicts your participation, which is corresponding with the disciplinary report.*

*My conclusion is that no due-process failure occurred in the disposition of your disciplinary report. I find no reason to modify the Hearing Officer's decision.*

Sincerely,

Nick Rodriguez
District Administrator

C:    Warden Reis
       Warden Guadarrama
       Administrative Remedies Coordinator

# Exhibit #6

### #1-page

Exhibit Proves there is
a State Sanctioned policy
To Inflict Physical, emotional,
and mental.



# Judiciary Committee votes for sweeping solitary confinement reform

RAZEL SUANSING 12:09 AM, APR 15, 2021

After successfully pushing to close the state's only maximum-security prison this year, Connecticut activists are advocating for more reforms in the state's solitary confinement practices.

The PROTECT Act — which stands for Promoting Responsible Oversight and Treatment, and Ensuring Correctional Transparency — was passed with bipartisan support by the legislative Judiciary Committee on Thursday. The bill would implement new limitations on solitary confinement and increase support for Department of Correction staff, among other policies. At the hearing, several activists spoke in favor of the bill, while CT DOC Commissioner Angel Quiros spoke against it. New Haven legislators Rep. Robyn Porter and Sen. Martin Looney are among the bill's co-sponsors. The bill now awaits a vote on the House floor.

"Our legislators took a stand against state sanctioned abuse and suffering of people behind the walls of Connecticut's prisons," New Haven activist and Stop Solitary CT Steering Committee Member Barbara Fair wrote in an April 8 press release. "Legislators chose to close this ugly chapter in Corrections and demand humane treatment for all men, women and children held in State custody."

If passed, the bill would prohibit the solitary confinement of incarcerated individuals for more than 72 hours in a 14-day period. Confinement of 16 hours or more consecutively would also become illegal, except in the case of a facility-wide lockdown, an imminent threat of physical harm to another incarcerated person or a request of protective segregation by the incarcerated person.

The bill also calls for the limiting of abusive restraint, especially for longer than four consecutive hours. Restraints include belts, handcuffs or chains that constrict an incarcerated person's movement. Incarcerated individuals would also be allowed out of their cells for eight hours a day.

Under the bill, incarcerated people would be guaranteed a minimum number of free letters, phone calls and visits. Due to the pandemic, visitors currently cannot spend more than 30 minutes with incarcerated individuals more than twice a week, and Connecticut is known to be the state where prison phone calls are most expensive.

UN Special Rapporteur on Torture Nils Melzer described the current CT DOC policies as almost amounting to torture.

"The DOC appears to routinely resort to repressive measures, such as prolonged or indefinite isolation, excessive use of in-cell restraints and needlessly intrusive strip searches," Melzer wrote in a press release. "There seems to be a state-sanctioned policy aimed at purposefully inflicting severe pain or suffering, physical or mental, which may well amount to torture."

The bill would also seek to promote correctional officer wellness by offering staff access to workers' compensation for mental health conditions related to their work. In an effort to strengthen the public lever of accountability, the bill would also create a community advisory council of 5 to 9 Connecticut residents, one-third of whom must be formerly incarcerated people. This council can investigate

Exhibit # 7

American with Disabilities
Act / The Rehabilitation Act

21-Pages

# INMATE PHOTO RELEASE FORM

Name:_____   #_____

Housing Unit:_____            Cell :_____

**Print neat and clear. If it cannot be read your form can not be processed.**

Photo Days &Time- Schedule at Facility discretion, Location-Gym

**RULES & PROCEDURES:**

Funds will be deducted from your account before photos are taken.

### NO FUNDS, NO PHOTOS, NO EXCEPTIONS

1) No tickets for the past 120 Days.
2) No more than one (1) inmate will be allowed in a picture. NO EXCEPTIONS
3) No posters, pictures, books, or any other periodical will be allowed in photo.
4) You must allow at least three to four weeks for processing.
5) You must allow at least one week for photos to be passed out after being taken.
6) No more than three (3) photos can be purchased at any given time.

This program is for the Inmate Population and in order for it to be a success your full cooperation is needed.

- Any disrespect towards staff or photo personnel will result in your suspension from the program
- In the event that you transfer and have already take a photo(s), contact the photo coordinator with the necessary information so the photo(s) can be forwarded to you.
- If you transfer prior to taking a photo but the money has already been deducted from your account, your money will be refunded by the previous facility.

CIRCLE ONE- Circle the number of photos and the amount requested to deduct:

1 photo -- $2.00        2 photos -- $4.00        3 photos -- $6.00

*Please deduct this amount from my inmate account and transfer it to the

CHESHIRE C.I. Special Activity Photo Fund

Inmate Signature:_____          Date:_____

Recreation Supervisor:_____          Date:_____

SUBCHAPTER III—CONSTRUCTION 
   10851.
   Construction of subchapters I and II; "individual with mental illness" defined.


# SUBCHAPTER I—PROTECTION AND ADVOCACY SYSTEMS


## Part A—Establishment of Systems

## §10801. Congressional findings and statement of purpose

   (a) The Congress finds that—

     (1) individuals with mental illness are vulnerable to abuse and serious injury;

     (2) family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors, the individuals are legally competent and choose to involve the family members, and the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family;

     (3) individuals with mental illness are subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning; and

     (4) State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate.

   (b) The purposes of this chapter are—

     (1) to ensure that the rights of individuals with mental illness are protected; and

     (2) to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will—

       (A) protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and

       (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

(Pub. L. 99–319, title I, §101, May 23, 1986, 100 Stat. 478; Pub. L. 102–173, §§3, 10(2), Nov. 27, 1991, 105 Stat. 1217, 1219.)

EDITORIAL NOTES

REFERENCES IN TEXT

   This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 99–319, May 23, 1986, 100 Stat. 478, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note below and Tables.

AMENDMENTS

   **1991**—Subsec. (a). Pub. L. 102–173, §10(2), substituted "individuals with mental illness" for "mentally ill individuals" in three places.

Subsec. (a)(2) to (4). Pub. L. 102–173, §3, added par. (2) and redesignated former pars. (2) and (3) as (3) and (4), respectively.

Subsec. (b). Pub. L. 102–173, §10(2), substituted "individuals with mental illness" for "mentally ill individuals" in three places.

STATUTORY NOTES AND RELATED SUBSIDIARIES

SHORT TITLE OF 1991 AMENDMENT

Pub. L. 102–173, §1, Nov. 27, 1991, 105 Stat. 1217, provided that: "This Act [amending this section and sections 10802 to 10807, 10821, 10824, 10826, 10827, 10841, and 10851 of this title] may be cited as the 'Protection and Advocacy for Mentally Ill Individuals Amendments Act of 1991'."

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–509, §1, Oct. 20, 1988, 102 Stat. 2543, provided that: "This Act [amending sections 10802, 10804 to 10806, 10821, 10822, 10825, and 10827 of this title and enacting a provision set out as a note under section 10827 of this title] may be cited as the 'Protection and Advocacy for Mentally Ill Individuals Amendments Act of 1988'."

SHORT TITLE

Pub. L. 99–319, §1, May 23, 1986, 100 Stat. 478, as amended by Pub. L. 106–310, div. B, title XXXII, §3206(a), Oct. 17, 2000, 114 Stat. 1193, provided that: "This Act [enacting this chapter and section 247a of this title and enacting provisions set out as a note below] may be cited as the 'Protection and Advocacy for Individuals with Mental Illness Act'."

SUPERSEDURE OF BALANCED BUDGET PROVISIONS

Pub. L. 99–319, title IV, §402, May 23, 1986, 100 Stat. 490, provided that: "This Act [see Short Title note above] shall not be construed as superseding any of the balanced budget provisions set forth in section 3(7) of the Congressional Budget and Impoundment Control Act of 1974 [2 U.S.C. 622(7)]."

## §10802. Definitions

For purposes of this subchapter:

(1) The term "abuse" means any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a [1] individual with mental illness, and includes acts such as—

(A) the rape or sexual assault of a [1] individual with mental illness;

(B) the striking of a [1] individual with mental illness;

(C) the use of excessive force when placing a [1] individual with mental illness in bodily restraints; and

(D) the use of bodily or chemical restraints on a [1] individual with mental illness which is not in compliance with Federal and State laws and regulations.

(2) The term "eligible system" means the system established in a State to protect and advocate the rights of persons with developmental disabilities under subtitle C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 [42 U.S.C. 15041 et seq.].

(3) The term "facilities" may include, but need not be limited to, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons.

(4) The term "individual with mental illness" means, except as provided in section 10804(d) of this title, an individual—

(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and

(B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;

(II) who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or"; [2]

(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.

(5) The term "neglect" means a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a [1] individual with mental illness or which placed a [1] individual with mental illness at risk of injury or death, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment plan for a [1] individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a [1] individual with mental illness, or the failure to provide a safe environment for a [1] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff.

(6) The term "Secretary" means the Secretary of Health and Human Services.

(7) The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands.

(8) The term "American Indian consortium" means a consortium established under part C of the Developmental Disabilities Assistance and Bill of Rights Act [3] (42 U.S.C. 6042 et seq.).

(Pub. L. 99–319, title I, §102, May 23, 1986, 100 Stat. 478; Pub. L. 100–509, §3, Oct. 20, 1988, 102 Stat. 2543; Pub. L. 102–173, §§4, 10(1), Nov. 27, 1991, 105 Stat. 1217, 1219; Pub. L. 106–310, div. B, title XXXII, §3206(b), Oct. 17, 2000, 114 Stat. 1194; Pub. L. 106–402, title IV, §401(b)(13)(A), Oct. 30, 2000, 114 Stat. 1739.)

EDITORIAL NOTES

REFERENCES IN TEXT

The Developmental Disabilities Assistance and Bill of Rights Act of 2000, referred to in par. (2), is Pub. L. 106–402, Oct. 30, 2000, 114 Stat. 1677. Subtitle C of the Act probably means subtitle C of title I of the Act, which is classified generally to part C (§15041 et seq.) of subchapter I of chapter 144 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 15001 of this title and Tables.

The Developmental Disabilities Assistance and Bill of Rights Act, referred to in par. (8), is title I of Pub. L. 88–164, as added by Pub. L. 98–527, §2, Oct. 19, 1984, 98 Stat. 2662, which was repealed by Pub. L. 106–402, title IV, §401(a), Oct. 30, 2000, 114 Stat. 1737. Part C of the Act was classified generally to subchapter III (§6041 et seq.) of chapter 75 of this title. Provisions similar to former part C of the Act are contained in subtitle C of title I of the Developmental

Disabilities Assistance and Bill of Rights Act of 2000, Pub. L. 106–402, which is classified generally to part C (§15041 et seq.) of subchapter I of chapter 144 of this title.

AMENDMENTS

**2000**—Par. (2). Pub. L. 106–402 substituted "subtitle C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000" for "part C of the Developmental Disabilities Assistance and Bill of Rights Act".

Par. (4). Pub. L. 106–310, §3206(b)(1)(A), inserted ", except as provided in section 10804(d) of this title," after "means" in introductory provisions.

Par. (4)(B). Pub. L. 106–310, §3206(b)(1)(B), designated existing provisions as cl. (i), redesignated former cls. (i) to (iii) as subcls. (I) to (III), respectively, of cl. (i), and added cl. (ii).

Par. (8). Pub. L. 106–310, §3206(b)(2), added par. (8).

**1991**—Par. (1). Pub. L. 102–173, §10(1), substituted "individual with mental illness" for "mentally ill individual" wherever appearing.

Pars. (3) to (7). Pub. L. 102–173 added par. (3), redesignated former pars. (3) to (6) as (4) to (7), respectively, and substituted "individual with mental illness" for "mentally ill individual" wherever appearing in pars. (4) and (5).

**1988**—Par. (1). Pub. L. 100–509, §3(1), inserted "or death" after "caused, injury".

Par. (3)(B). Pub. L. 100–509, §3(2), designated existing provisions as cl. (i), substituted ", even if the whereabouts of such inpatient or resident are unknown;" for period at end, and added cls. (ii) and (iii).

Par. (4). Pub. L. 100–509, §3(3), inserted "or death" after "injury" in two places and inserted before period at end ", including the failure to maintain adequate numbers of appropriately trained staff".


EXECUTIVE DOCUMENTS

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

[1] *So in original. Probably should be "an".*

[2] *So in original.*

[3] *See References in Text note below.*

# §10803. Allotments

The Secretary shall make allotments under this subchapter to eligible systems to establish and administer systems—

(1) which meet the requirements of section 10805 of this title; and

(2) which are designed to—

(A) protect and advocate the rights of individuals with mental illness; and

(B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

(Pub. L. 99–319, title I, §103, May 23, 1986, 100 Stat. 479; Pub. L. 102–173, §10(2), Nov. 27, 1991, 105 Stat. 1219.)

EDITORIAL NOTES

AMENDMENTS

**1991**—Par. (2). Pub. L. 102–173 substituted "individuals with mental illness" for "mentally ill individuals" in two places.

## §10804. Use of allotments

### (a) Contracts

(1) An eligible system may use its allotment under this subchapter to enter into contracts with State agencies and nonprofit organizations which operate throughout the State. In order to be eligible for a contract under this paragraph—

(A) such an agency shall be independent of any agency which provides treatment or services (other than advocacy services) to individuals with mental illness; and

(B) such an agency or organization shall have the capacity to protect and advocate the rights of individuals with mental illness.

(2) In carrying out paragraph (1), an eligible system should consider entering into contracts with organizations including, in particular, groups run by individuals who have received or are receiving mental health services, or the family members of such individuals, which,[1] provide protection or advocacy services to individuals with mental illness.

### (b) Obligation of allotments; technical assistance and training

(1) If an eligible system is a public entity, the government of the State in which the system is located may not require the system to obligate more than 5 percent of its allotment under this subchapter in any fiscal year for administrative expenses.

(2) An eligible system may not use more than 10 percent of any allotment under this subchapter for any fiscal year for the costs of providing technical assistance and training to carry out this subchapter.

### (c) Representation of individuals with mental illness

An eligible system may use its allotment under this subchapter to provide representation to individuals with mental illness in Federal facilities who request representation by the eligible system. Representatives of such individuals from such system shall be accorded all the rights and authority accorded to other representatives of residents of such facilities pursuant to State law and other Federal laws.

### (d) Definition for purposes of representation of individuals with mental illness; priority

The definition of "individual with a mental illness" contained in section 10802(4)(B)(iii) [2] of this title shall apply, and thus an eligible system may use its allotment under this subchapter to provide representation to such individuals, only if the total allotment under this subchapter for any fiscal year is $30,000,000 or more, and in such case, an eligible system must give priority to representing persons with mental illness as defined in subparagraphs (A) and (B)(i) of section 10802(4) of this title.

(Pub. L. 99–319, title I, §104, May 23, 1986, 100 Stat. 479; Pub. L. 100–509, §7(a), (b)(1), Oct. 20, 1988, 102 Stat. 2544; Pub. L. 102–173, §§5, 10(2), Nov. 27, 1991, 105 Stat. 1217, 1219; Pub. L. 106–310, div. B, title XXXII, §3206(c), Oct. 17, 2000, 114 Stat. 1194.)

EDITORIAL NOTES

REFERENCES IN TEXT

Section 10802(4)(B)(iii) of this title, referred to in subsec. (d), was redesignated section 10802(4)(B)(i)(III) of this title by Pub. L. 106–310, div. B, title XXXII, §3206(b)(1)(B)(i), (ii), Oct. 17, 2000, 114 Stat. 1194.

AMENDMENTS

**2000**—Subsec. (d). Pub. L. 106–310 added subsec. (d).

**1991**—Subsec. (a). Pub. L. 102–173, §10(2), substituted "individuals with mental illness" for "mentally ill individuals" in three places.

Subsec. (c). Pub. L. 102–173, §5, added subsec. (c).

**1988**—Subsec. (a)(2). Pub. L. 100–509, §7(a), substituted "including, in particular, groups run by individuals who have received or are receiving mental health services, or the family members of such individuals, which" for "which, on May 23, 1986".

Subsec. (b)(2). Pub. L. 100–509, §7(b)(1), substituted "10" for "5".

[1] So in original. The comma probably should not appear.

[2] See References in Text note below.

# §10805. System requirements

## (a) Authority; independent status; access to facilities and records; advisory council; annual report; grievance procedure

A system established in a State under section 10803 of this title to protect and advocate the rights of individuals with mental illness shall—

(1) have the authority to—

(A) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred;

(B) pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and

(C) pursue administrative, legal, and other remedies on behalf of an individual who—

(i) was a [1] individual with mental illness; and

(ii) is a resident of the State,

but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment;

(2) be independent of any agency in the State which provides treatment or services (other than advocacy services) to individuals with mental illness;

(3) have access to facilities in the State providing care or treatment;

(4) in accordance with section 10806 of this title, have access to all records of—

(A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

(B) any individual (including an individual who has died or whose whereabouts are unknown)—

(i) who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect; and

(C) any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever—

(i) such representative has been contacted by such system upon receipt of the name and address of such representative;

(ii) such system has offered assistance to such representative to resolve the situation; and

(iii) such representative has failed or refused to act on behalf of the individual;

(5) have an arrangement with the Secretary and the agency of the State which administers the State plan under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] for the furnishing of the information required by subsection (b);

(6) establish an advisory council—

(A) which will advise the system on policies and priorities to be carried out in protecting and advocating the rights of individuals with mental illness;

(B) which shall include attorneys, mental health professionals, individuals from the public who are knowledgeable about mental illness, a provider of mental health services, individuals who have received or are receiving mental health services, and family members of such individuals, and at least 60 percent the membership of which shall be comprised of individuals who have received or are receiving mental health services or who are family members of such individuals; and

(C) which shall be chaired by an individual who has received or is receiving mental health services or who is a family member of such an individual;

(7) on January 1, 1987, and January 1 of each succeeding year, prepare and transmit to the Secretary and the head of the State mental health agency of the State in which the system is located, and make publicly available, a report describing the activities, accomplishments, and expenditures of the system during the most recently completed fiscal year, including a section prepared by the advisory council that describes the activities of the council and its assessment of the operations of the system;

(8) on an annual basis, provide the public with an opportunity to comment on the priorities established by, and the activities of, the system;

(9) establish a grievance procedure for clients or prospective clients of the system to assure that individuals with mental illness have full access to the services of the system and for individuals who have received or are receiving mental health services, family members of such individuals with mental illness, or representatives of such individuals or family members

to assure that the eligible system is operating in compliance with the provisions of this subchapter and subchapter III; and

(10) not use allotments provided to a system in a manner inconsistent with section 14404 of this title.

## (b) Annual survey report; plan of corrections

The Secretary and the agency of a State which administers its State plan under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] shall provide the eligible system of the State with a copy of each annual survey report and plan of corrections for cited deficiencies made pursuant to titles XVIII and XIX of the Social Security Act [42 U.S.C. 1395 et seq., 1396 et seq.] with respect to any facility rendering care or treatment to individuals with mental illness in the State in which such system is located. A report or plan shall be made available within 30 days after the completion of the report or plan.

## (c) Governing authority

(1)(A) Each system established in a State, through allotments received under section 10803 of this title, to protect and advocate the rights of individuals with mental illness shall have a governing authority.

(B) In States in which the governing authority is organized as a private non-profit entity with a multi-member governing board, or a public system with a multi-member governing board, such governing board shall be selected according to the policies and procedures of the system. The governing board shall be composed of—

(i) members (to be selected no later than October 1, 1990) who broadly represent or are knowledgeable about the needs of the clients served by the system; and

(ii) in the case of a governing authority organized as a private non-profit entity, members who broadly represent or are knowledgeable about the needs of the clients served by the system including the chairperson of the advisory council of such system.

As used in this subparagraph, the term "members who broadly represent or are knowledgeable about the needs of the clients served by the system" shall be construed to include individuals who have received or are receiving mental health services and family members of such individuals.

(2) The governing authority established under paragraph (1) shall—

(A) be responsible for the planning, design, implementation, and functioning of the system; and

(B) consistent with subparagraph (A), jointly develop the annual priorities of the system with the advisory council.

(Pub. L. 99–319, title I, §105, May 23, 1986, 100 Stat. 480; Pub. L. 100–509, §§4–6(a), 7(c), Oct. 20, 1988, 102 Stat. 2543–2545; Pub. L. 102–173, §§6, 10, Nov. 27, 1991, 105 Stat. 1218, 1219; Pub. L. 105–12, §9(m), Apr. 30, 1997, 111 Stat. 28; Pub. L. 114–255, div. B, title VI, §6022(a), Dec. 13, 2016, 130 Stat. 1216.)

EDITORIAL NOTES

REFERENCES IN TEXT

The Social Security Act, referred to in subsecs. (a)(5) and (b), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Titles XVIII and XIX of the Social Security Act are classified generally to subchapters XVIII (§1395 et seq.) and XIX (§1396 et seq.) of chapter 7 of this title, respectively. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

AMENDMENTS

**2016**—Subsec. (a)(7). Pub. L. 114–255 substituted "is located, and make publicly available, a report" for "is located a report".

**1997**—Subsec. (a)(10). Pub. L. 105–12 added par. (10).

**1991**—Subsec. (a). Pub. L. 102–173, §10, substituted "individual with mental illness" for "mentally ill individual" and "individuals with mental illness" for "mentally ill individuals" wherever appearing.

Subsec. (a)(4). Pub. L. 102–173, §6(a), inserted "as a result of monitoring or other activities (either of which result from a complaint or other evidence)" before "there is" in subpar. (B)(iii) and added subpar. (C).

Subsec. (a)(6). Pub. L. 102–173, §6(b), substituted "60 percent" for "one-half" in subpar. (B) and added subpar. (C).

Subsec. (a)(9). Pub. L. 102–173, §6(c), inserted before period at end "and for individuals who have received or are receiving mental health services, family members of such individuals with mental illness, or representatives of such individuals or family members to assure that the eligible system is operating in compliance with the provisions of this subchapter and subchapter III".

Subsec. (b). Pub. L. 102–173, §10(2), substituted "individuals with mental illness" for "mentally ill individuals".

Subsec. (c)(1). Pub. L. 102–173, §§6(d), 10(2), substituted "individuals with mental illness" for "mentally ill individuals" in subpar. (A) and inserted at end of subpar. (B) "As used in this subparagraph, the term 'members who broadly represent or are knowledgeable about the needs of the clients served by the system' shall be construed to include individuals who have received or are receiving mental health services and family members of such individuals."

**1988**—Subsec. (a)(4)(B). Pub. L. 100–509, §6(a), inserted "(including an individual who has died or whose whereabouts are unknown)" after "any individual".

Subsec. (a)(6). Pub. L. 100–509, §4(1), substituted "an advisory council" for "a board".

Subsec. (a)(7). Pub. L. 100–509, §5, substituted ", including a section prepared by the advisory council that describes the activities of the council and its assessment of the operations of the system;" for period at end.

Subsec. (a)(8), (9). Pub. L. 100–509, §7(c), added pars. (8) and (9).

Subsec. (c). Pub. L. 100–509, §4(2), added subsec. (c).


STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF **1997** AMENDMENT

Amendment by Pub. L. 105–12 effective Apr. 30, 1997, and applicable to Federal payments made pursuant to obligations incurred after Apr. 30, 1997, for items and services provided on or after such date, subject to also being applicable with respect to contracts entered into, renewed, or extended after Apr. 30, 1997, as well as contracts entered into before Apr. 30, 1997, to the extent permitted under such contracts, see section 11 of Pub. L. 105–12, set out as an Effective Date note under section 14401 of this title.

¹ *So in original. Probably should be "an".*

## §10806. Access to records

(a) An eligible system which, pursuant to section 10805(a)(4) of this title, has access to records which, under Federal or State law, are required to be maintained in a confidential manner by a provider of mental health services, shall, except as provided in subsection (b), maintain the confidentiality of such records to the same extent as is required of the provider of such services.

(b)(1) Except as provided in paragraph (2), an eligible system which has access to records pursuant to section 10805(a)(4) of this title may not disclose information from such records to the individual who is the subject of the information if the mental health professional responsible for supervising the provision of mental health services to such individual has provided the system with a written determination that disclosure of such information to such individual would be detrimental to such individual's health.

(2)(A) If disclosure of information has been denied under paragraph (1) to an individual—

(i) such individual;

(ii) the legal guardian, conservator, or other legal representative of such individual; or

(iii) an eligible system, acting on behalf of an individual described in subparagraph (B),

may select another mental health professional to review such information and to determine if disclosure of such information would be detrimental to such individual's health. If such mental health professional determines, based on professional judgment, that disclosure of such information would not be detrimental to the health of such individual, the system may disclose such information to such individual.

(B) An eligible system may select a mental health professional under subparagraph (A)(iii) on behalf of—

(i) an individual whose legal guardian is the State; or

(ii) an individual who has a legal guardian, conservator, or other legal representative other than the State if such guardian, conservator, or representative does not, within a reasonable time after such individual is denied access to information under paragraph (1), select a mental health professional under subparagraph (A) to review such information.

(C) If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with section 10805(a)(4) of this title and this section, section 10805(a)(4) of this title and this section shall not apply to such system before—

(i) the date such system is no longer subject to such a prohibition; or

(ii) the expiration of the 2-year period beginning on May 23, 1986,

whichever occurs first.

(3)(A) As used in this section, the term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

(B) An eligible system shall have access to the type of records described in subparagraph (A) in accordance with the provisions of subsection (a) and paragraphs (1) and (2) of subsection (b).

(Pub. L. 99–319, title I, §106, May 23, 1986, 100 Stat. 481; Pub. L. 100–509, §6(b), Oct. 20, 1988, 102 Stat. 2544; Pub. L. 102–173, §10(2), Nov. 27, 1991, 105 Stat. 1219.)

EDITORIAL NOTES

AMENDMENTS

**1991**—Subsec. (b)(2)(C). Pub. L. 102–173 substituted "individuals with mental illness" for "mentally ill individuals".

**1988**—Subsec. (b)(3). Pub. L. 100–509 added par. (3).

## §10807. Legal actions

(a) Prior to instituting any legal action in a Federal or State court on behalf of a [1] individual with mental illness, an eligible system, or a State agency or nonprofit organization which entered into a contract with an eligible system under section 10804(a) of this title, shall exhaust in a timely manner all administrative remedies where appropriate. If, in pursuing administrative remedies, the system, agency, or organization determines that any matter with respect to such individual will not be resolved within a reasonable time, the system, agency, or organization may pursue alternative remedies, including the initiation of a legal action.

(b) Subsection (a) does not apply to any legal action instituted to prevent or eliminate imminent serious harm to a [1] individual with mental illness.

(Pub. L. 99–319, title I, §107, May 23, 1986, 100 Stat. 482; Pub. L. 102–173, §10(1), Nov. 27, 1991, 105 Stat. 1219.)

EDITORIAL NOTES

AMENDMENTS

**1991**—Pub. L. 102–173 substituted "individual with mental illness" for "mentally ill individual" in subsecs. (a) and (b).

[1] *So in original. Probably should be "an".*

## Part B—Administrative Provisions

## §10821. Applications

### (a) Submission for allotment; contents

No allotment may be made under this subchapter to an eligible system unless an application therefor is submitted to the Secretary. Each such application shall contain—

(1) assurances that amounts paid to such system from an allotment under this subchapter will be used to supplement and not to supplant the level of non-Federal funds available in the State in which such system is established to protect and advocate the rights of individuals with mental illness;

(2) assurances that such system will have a staff which is trained or being trained to provide advocacy services to individuals with mental illness and to work with family members of clients served by the system where the individuals with mental illness are minors, legally competent and do not object, and legally incompetent and the legal guardians, conservators, or other legal representatives are family members;

(3) assurances that such system, and any State agency or nonprofit organization with which such system may enter into a contract under section 10804(a) of this title, will not, in the case of any individual who has a legal guardian, conservator, or representative other than the State, take actions which are duplicative of actions taken on behalf of such individual by

such guardian, conservator, or representative unless such guardian, conservator, or representative requests the assistance of such system; and

    (4) such other information as the Secretary may by regulation prescribe.

**(b) Satisfaction of requirements regarding trained staff**

The assurance required under subsection (a)(2) regarding trained staff may be satisfied through the provision of training by individuals who have received or are receiving mental health services and family members of such individuals.

**(c) Duration of applications and assurances**

Applications submitted under this section shall remain in effect for a 4-year period, and the assurances required under this section shall be for the same 4-year period.

(Pub. L. 99–319, title I, §111, May 23, 1986, 100 Stat. 482; Pub. L. 100–509, §7(d), Oct. 20, 1988, 102 Stat. 2545; Pub. L. 102–173, §§7, 10(2), Nov. 27, 1991, 105 Stat. 1218, 1219; Pub. L. 102–321, title I, §163(c)(3)(A), July 10, 1992, 106 Stat. 377.)

EDITORIAL NOTES

AMENDMENTS

1992—Subsec. (c). Pub. L. 102–321 substituted "4-year" for "3-year" in two places.

1991—Subsec. (a)(1). Pub. L. 102–173, §10(2), substituted "individuals with mental illness" for "mentally ill individuals".

Subsec. (a)(2). Pub. L. 102–173, §§7(1), 10(2), substituted "individuals with mental illness" for "mentally ill individuals" and inserted before semicolon at end "and to work with family members of clients served by the system where the individuals with mental illness are minors, legally competent and do not object, and legally incompetent and the legal guardians, conservators, or other legal representatives are family members".

Subsecs. (b), (c). Pub. L. 102–173, §7(2), (3) added subsec. (b) and redesignated former subsec. (b) as (c).

1988—Pub. L. 100–509 designated existing provisions as subsec. (a) and added subsec. (b).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–321 effective Oct. 1, 1992, with provision for programs providing financial assistance, see section 801(c), (d) of Pub. L. 102–321, set out as a note under section 236 of this title.

## §10822. Allotment formula and reallotments

(a)(1)(A) Except as provided in paragraph (2) and subject to the availability of appropriations under section 10827 of this title, the Secretary shall make allotments under section 10803 of this title from amounts appropriated under section 10827 of this title for a fiscal year to eligible systems on the basis of a formula prescribed by the Secretary which is based equally—

    (i) on the population of each State in which there is an eligible system; and

    (ii) on the population of each such State weighted by its relative per capita income.

(B) For purposes of subparagraph (A)(ii), the term "relative per capita income" means the quotient of the per capita income of the United States and the per capita income of the State, except that if the State is Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Marshall Islands, the Federated States of Micronesia, the Republic of Palau, or the Virgin Islands, the quotient shall be considered to be one.

(2)(A) The minimum amount of the allotment of an eligible system shall be the product (rounded to the nearest $100) of the appropriate base amount determined under subparagraph (B) and the factor specified in subparagraph (C).

(B) For purposes of subparagraph (A), the appropriate base amount—

(i) for American Samoa, Guam, the Marshall Islands, the Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, and the Virgin Islands, is $139,300; and

(ii) for any other State, is $260,000.

(C) The factor specified in this subparagraph is the ratio of the amount appropriated under section 10827 of this title for the fiscal year for which the allotment is being made to the amount appropriated under such section for fiscal year 1995.

(D) If the total amount appropriated for a fiscal year is at least $25,000,000, the Secretary shall make an allotment in accordance with subparagraph (A) to the eligible system serving the American Indian consortium.

(b)(1) To the extent that all the amounts appropriated under section 10827 of this title for a fiscal year are not allotted to eligible systems because—

(A) one or more eligible systems have not submitted an application for an allotment for such fiscal year; or

(B) one or more eligible systems have notified the Secretary that they do not intend to use the full amount of their allotment,

the amount which is not so allotted shall be reallotted among the remaining eligible systems.

(2) The amount of an allotment to an eligible system for a fiscal year which the Secretary determines will not be required by the system during the period for which it is available shall be available for reallotment by the Secretary to other eligible systems with respect to which such a determination has not been made.

(3) The Secretary shall make reallotments under paragraphs (1) and (2) on such date or dates as the Secretary may fix (but not earlier than 30 days after the Secretary has published notice of the intention of the Secretary to make such reallotment in the Federal Register). A reallotment to an eligible system shall be made in proportion to the original allotment of such system for such fiscal year, but with such proportionate amount for such system being reduced to the extent it exceeds the sum the Secretary estimates such system needs and will be able to use during such period. The total of such reductions shall be similarly reallotted among eligible systems whose proportionate amounts were not so reduced. Any amount so reallotted to an eligible system for a fiscal year shall be deemed to be a part of its allotment under subsection (a) for such fiscal year.

(Pub. L. 99–319, title I, §112, May 23, 1986, 100 Stat. 483; Pub. L. 100–509, §7(e), Oct. 20, 1988, 102 Stat. 2545; Pub. L. 106–310, div. B, title XXXII, §3206(d), (e), Oct. 17, 2000, 114 Stat. 1194, 1195.)

EDITORIAL NOTES

AMENDMENTS

**2000**—Subsec. (a)(1)(B). Pub. L. 106–310, §3206(e)(1), substituted "Marshall Islands, the Federated States of Micronesia, the Republic of Palau" for "Trust Territory of the Pacific Islands".

Subsec. (a)(2). Pub. L. 106–310, §3206(d), amended par. (2) generally. Prior to amendment, par. (2) specified minimum amounts of allotments to eligible systems of each State, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and the Virgin Islands based on whether the total amount appropriated in a fiscal year was at least $13,000,000 or less than $13,000,000.

Subsec. (a)(3). Pub. L. 106–310, §3206(e)(2), struck out par. (3) which read as follows: "In any case in which the total amount appropriated under section 10827 of this title for a fiscal year exceeds the total amount appropriated under such section, as in effect on October 19, 1988, for the preceding fiscal year by a percentage greater than the most recent percentage change in the Consumer Price Index published by the Secretary of Labor under section 720(c)(1) of title 29, the Secretary shall increase each of the allotments under clauses (i)(II) and (ii)(II) of subparagraph (A) and clauses (i) and (ii) of subparagraph (B) of paragraph (2) by an amount which bears the same ratio to the amount of such minimum allotment (including any increases in such minimum allotment under this paragraph for prior fiscal years) as the amount which is equal to the difference between—

"(A) the total amount appropriated under section 10827 of this title for the fiscal year for which the increase in minimum allotment is made, minus;

"(B) the total amount appropriated under section 10827 of this title for the immediately preceding fiscal year,

bears to the total amount appropriated under section 10827 of this title for such preceding fiscal year."

**1988**—Subsec. (a)(2). Pub. L. 100–509, §7(e)(1), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "Notwithstanding paragraph (1) and subject to the availability of appropriations under section 10827 of this title—

"(A) the amount of the allotment of the eligible system of each of the several States, the District of Columbia, and the Commonwealth of Puerto Rico shall not be less than $125,000; and

"(B) the amount of the allotment of the eligible system of Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and the Virgin Islands shall not be less than $67,000."

Subsec. (a)(3). Pub. L. 100–509, §7(e)(2), added par. (3).

## §10823. Payments under allotments

For each fiscal year, the Secretary shall make payments to each eligible system from its allotment under this subchapter. Any amount paid to an eligible system for a fiscal year and remaining unobligated at the end of such year shall remain available to such system for the next fiscal year for the purposes for which it was made.

(Pub. L. 99–319, title I, §113, May 23, 1986, 100 Stat. 484.)

## §10824. Reports by Secretary

(a) The Secretary shall include in each report required under section 15005 of this title a separate statement which contains—

(1) a description of the activities, accomplishments, and expenditures of systems to protect and advocate the rights of individuals with mental illness supported with payments from allotments under this subchapter, including—

(A) a specification of the total number of individuals with mental illness served by such systems;

(B) a description of the types of activities undertaken by such systems;

(C) a description of the types of facilities providing care or treatment with respect to which such activities are undertaken;

(D) a description of the manner in which such activities are initiated; and

(E) a description of the accomplishments resulting from such activities;

(2) a description of—

(A) systems to protect and advocate the rights of individuals with mental illness supported with payments from allotments under this subchapter;

(B) activities conducted by States to protect and advocate such rights;

(C) mechanisms established by residential facilities for individuals with mental illness to protect and advocate such rights; and

(D) the coordination among such systems, activities, and mechanisms;

(3) a specification of the number of systems established with allotments under this subchapter and of whether each such system was established by a public or nonprofit private entity;

(4) recommendations for activities and services to improve the protection and advocacy of the rights of individuals with mental illness and a description of needs for such activities and services which have not been met by systems established under this subchapter; and

(5) using data from the existing required annual program progress reports submitted by each system funded under this subchapter, a detailed accounting for each such system of how funds are spent, disaggregated according to whether the funds were received from the Federal Government, the State government, a local government, or a private entity.

(b) In preparing each statement required by subsection (a), the Secretary shall use and include information submitted to the Secretary in the reports required under section 10805(a)(7) of this title.

(Pub. L. 99–319, title I, §114, May 23, 1986, 100 Stat. 484; Pub. L. 102–173, §10(2), Nov. 27, 1991, 105 Stat. 1219; Pub. L. 106–402, title IV, §401(b)(13)(B), Oct. 30, 2000, 114 Stat. 1739; Pub. L. 114–255, div. B, title VI, §6022(b), Dec. 13, 2016, 130 Stat. 1216.)

EDITORIAL NOTES

AMENDMENTS

**2016**—Subsec. (a)(5). Pub. L. 114–255 added par. (5).

**2000**—Subsec. (a). Pub. L. 106–402 substituted "section 15005 of this title" for "section 6006(c) of this title" in introductory provisions.

**1991**—Subsec. (a). Pub. L. 102–173 substituted "individuals with mental illness" for "mentally ill individuals" wherever appearing.

# §10825. Technical assistance

The Secretary shall use not more than 2 percent of the amounts appropriated under section 10827 of this title to provide technical assistance to eligible systems with respect to activities carried out under this subchapter, consistent with requests by such systems for such assistance.

(Pub. L. 99–319, title I, §115, May 23, 1986, 100 Stat. 484; Pub. L. 100–509, §7(b)(2), Oct. 20, 1988, 102 Stat. 2545.)

#### EDITORIAL NOTES

##### AMENDMENTS

**1988**—Pub. L. 100–509 amended section generally. Prior to amendment, section read as follows: "The Secretary shall provide technical assistance to eligible systems with respect to activities carried out under this subchapter."

## §10826. Administration

### (a) In general

The Secretary shall carry out this subchapter through the Administrator of the Substance Abuse and Mental Health Services Administration.

### (b) Regulations

Not later than 6 months after November 27, 1991, the Secretary shall promulgate final regulations to carry out this subchapter and subchapter III.

(Pub. L. 99–319, title I, §116, May 23, 1986, 100 Stat. 485; Pub. L. 102–173, §9, Nov. 27, 1991, 105 Stat. 1219; Pub. L. 102–321, title I, §163(c)(3)(B), July 10, 1992, 106 Stat. 377.)

#### EDITORIAL NOTES

##### AMENDMENTS

**1992**—Subsec. (a). Pub. L. 102–321 substituted "the Substance Abuse and Mental Health Services Administration" for "the Alcohol, Drug Abuse, and Mental Health Administration".

**1991**—Pub. L. 102–173 designated existing provisions as subsec. (a), inserted heading, and added subsec. (b).

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### EFFECTIVE DATE OF **1992** AMENDMENT

Amendment by Pub. L. 102–321 effective Oct. 1, 1992, see section 801(c) of Pub. L. 102–321, set out as a note under section 236 of this title.

## §10827. Authorization of appropriations

There are authorized to be appropriated for allotments under this subchapter, $19,500,000 for fiscal year 1992, and such sums as may be necessary for each of the fiscal years 1993 through 2003.

(Pub. L. 99–319, title I, §117, May 23, 1986, 100 Stat. 485; Pub. L. 100–509, §7(f), Oct. 20, 1988, 102 Stat. 2546; Pub. L. 102–173, §8, Nov. 27, 1991, 105 Stat. 1219; Pub. L. 106–310, div. B, title XXXII, §3206(f), Oct. 17, 2000, 114 Stat. 1195.)

EDITORIAL NOTES

AMENDMENTS

2000—Pub. L. 106–310 substituted "2003" for "1995".

1991—Pub. L. 102–173 amended section generally. Prior to amendment, section read as follows: "For allotments under this subchapter, there are authorized to be appropriated $14,300,000 for fiscal year 1989, and such sums as may be necessary for fiscal year 1990 and fiscal year 1991."

1988—Pub. L. 100–509 amended section generally. Prior to amendment, section read as follows: "For allotments under this subchapter, there are authorized to be appropriated $10,000,000 for fiscal year 1986, $10,500,000 for fiscal year 1987, and $11,025,000 for fiscal year 1988."

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–509, §8, Oct. 20, 1988, 102 Stat. 2546, provided that:

"(a) In General.—The amendments made by this Act [amending sections 10802, 10804 to 10806, 10821, 10822, and 10825 of this title], other than the amendment made by section 7(f) [amending this section], shall become effective on the date of the enactment of this Act [Oct. 20, 1988].

"(b) Authorization of Appropriations.—The amendment made by section 7(f) [amending this section] shall become effective on October 1, 1988."

*Supportive OF Plaintiff's A.D.A. Right's Violations*

# SUBCHAPTER II—RESTATEMENT OF BILL OF RIGHTS FOR MENTAL HEALTH PATIENTS

## §10841. Restatement of bill of rights

It is the sense of the Congress that, as previously stated in title V of the Mental Health Systems Act [42 U.S.C. 9501 et seq.], each State should review and revise, if necessary, its laws to ensure that mental health patients receive the protection and services they require, and that in making such review and revision, States should take into account the recommendations of the President's Commission on Mental Health and the following:

(1) A person admitted to a program or facility for the purpose of receiving mental health services should be accorded the following:

(A) The right to appropriate treatment and related services in a setting and under conditions that—

(i) are the most supportive of such person's personal liberty; and

(ii) restrict such liberty only to the extent necessary consistent with such person's treatment needs, applicable requirements of law, and applicable judicial orders.

(B) The right to an individualized, written, treatment or service plan (such plan to be developed promptly after admission of such person), the right to treatment based on such plan, the right to periodic review and reassessment of treatment and related service needs, and the right to appropriate revision of such plan, including any revision necessary to

provide a description of mental health services that may be needed after such person is discharged from such program or facility.

(C) The right to ongoing participation, in a manner appropriate to such person's capabilities, in the planning of mental health services to be provided such person (including the right to participate in the development and periodic revision of the plan described in subparagraph (B)), and, in connection with such participation, the right to be provided with a reasonable explanation, in terms and language appropriate to such person's condition and ability to understand, of—

(i) such person's general mental condition and, if such program or facility has provided a physical examination, such person's general physical condition;

(ii) the objectives of treatment;

(iii) the nature and significant possible adverse effects of recommended treatments;

(iv) the reasons why a particular treatment is considered appropriate;

(v) the reasons why access to certain visitors may not be appropriate; and

(vi) any appropriate and available alternative treatments, services, and types of providers of mental health services.

(D) The right not to receive a mode or course of treatment, established pursuant to the treatment plan, in the absence of such person's informed, voluntary, written consent to such mode or course of treatment, except treatment—

(i) during an emergency situation if such treatment is pursuant to or documented contemporaneously by the written order of a responsible mental health professional; or

(ii) as permitted under applicable law in the case of a person committed by a court to a treatment program or facility.

(E) The right not to participate in experimentation in the absence of such person's informed, voluntary, written consent, the right to appropriate protections in connection with such participation, including the right to a reasonable explanation of the procedure to be followed, the benefits to be expected, the relative advantages of alternative treatments, and the potential discomforts and risks, and the right and opportunity to revoke such consent.

(F) The right to freedom from restraint or seclusion, other than as a mode or course of treatment or restraint or seclusion during an emergency situation if such restraint or seclusion is pursuant to or documented contemporaneously by the written order of a responsible mental health professional.

(G) The right to a humane treatment environment that affords reasonable protection from harm and appropriate privacy to such person with regard to personal needs.

(H) The right to confidentiality of such person's records.

(I) The right to access, upon request, to such person's mental health care records, except such person may be refused access to—

(i) information in such records provided by a third party under assurance that such information shall remain confidential; and

(ii) specific material in such records if the health professional responsible for the mental health services concerned has made a determination in writing that such access would be detrimental to such person's health, except that such material may be made available to a similarly licensed health professional selected by such person and such health professional may, in the exercise of professional judgment, provide such person with access to any or all parts of such material or otherwise disclose the information contained in such material to such person.



(J) The right, in the case of a person admitted on a residential or inpatient care basis, to converse with others privately, to have convenient and reasonable access to the telephone



Supportive Legal Documentation of the Plaintiff (A.D.A.-violation's) and Civil Right's violation's, by (Jossean Crispin)

and mails, and to see visitors during regularly scheduled hours, except that, if a mental health professional treating such person determines that denial of access to a particular visitor is necessary for treatment purposes, such mental health professional may, for a specific, limited, and reasonable period of time, deny such access if such mental health professional has ordered such denial in writing and such order has been incorporated in the treatment plan for such person. An order denying such access should include the reasons for such denial.

(K) The right to be informed promptly at the time of admission and periodically thereafter, in language and terms appropriate to such person's condition and ability to understand, of the rights described in this section.

(L) The right to assert grievances with respect to infringement of the rights described in this section, including the right to have such grievances considered in a fair, timely, and impartial grievance procedure provided for or by the program or facility.

(M) Notwithstanding subparagraph (J), the right of access to (including the opportunities and facilities for private communication with) any available—

(i) rights protection service within the program or facility;

(ii) rights protection service within the State mental health system designed to be available to such person;

(iii) system established under subchapter I to protect and advocate the rights of individuals with mental illness; and

(iv) qualified advocate;

for the purpose of receiving assistance to understand, exercise, and protect the rights described in this section and in other provisions of law.

(N) The right to exercise the rights described in this section without reprisal, including reprisal in the form of denial of any appropriate, available treatment.

(O) The right to referral as appropriate to other providers of mental health services upon discharge.

(2)(A) The rights described in this section should be in addition to and not in derogation of any other statutory or constitutional rights.

(B) The rights to confidentiality of and access to records as provided in subparagraphs (H) and (I) of paragraph (1) should remain applicable to records pertaining to a person after such person's discharge from a program or facility.

(3)(A) No otherwise eligible person should be denied admission to a program or facility for mental health services as a reprisal for the exercise of the rights described in this section.

(B) Nothing in this section should—

(i) obligate an individual mental health or health professional to administer treatment contrary to such professional's clinical judgment;

(ii) prevent any program or facility from discharging any person for whom the provision of appropriate treatment, consistent with the clinical judgment of the mental health professional primarily responsible for such person's treatment, is or has become impossible as a result of such person's refusal to consent to such treatment;

(iii) require a program or facility to admit any person who, while admitted on prior occasions to such program or facility, has repeatedly frustrated the purposes of such admissions by withholding consent to proposed treatment; or

(iv) obligate a program or facility to provide treatment services to any person who is admitted to such program or facility solely for diagnostic or evaluative purposes.

(C) In order to assist a person admitted to a program or facility in the exercise or protection of such person's rights, such person's attorney or legal representatives should have reasonable access to—

 (i) such person;

 (ii) the areas of the program or facility where such person has received treatment, resided, or had access; and

 (iii) pursuant to the written authorization of such person, the records and information pertaining to such person's diagnosis, treatment, and related services described in paragraph (1)(I).

(D) Each program and facility should post a notice listing and describing, in language and terms appropriate to the ability of the persons to whom such notice is addressed to understand, the rights described in this section of all persons admitted to such program or facility. Each such notice should conform to the format and content for such notices, and should be posted in all appropriate locations.

(4)(A) In the case of a person adjudicated by a court of competent jurisdiction as being incompetent to exercise the right to consent to treatment or experimentation described in subparagraph (D) or (E) of paragraph (1), or the right to confidentiality of or access to records described in subparagraph (H) or (I) of such paragraph, or to provide authorization as described in paragraph (3)(C)(iii), such right may be exercised or such authorization may be provided by the individual appointed by such court as such person's guardian or representative for the purpose of exercising such right or such authorization.

(B) In the case of a person who lacks capacity to exercise the right to consent to treatment or experimentation under subparagraph (D) or (E) of paragraph (1), or the right to confidentiality of or access to records described in subparagraph (H) or (I) of such paragraph, or to provide authorization as described in paragraph (3)(C)(iii), because such person has not attained an age considered sufficiently advanced under State law to permit the exercise of such right or such authorization to be legally binding, such right may be exercised or such authorization may be provided on behalf of such person by a parent or legal guardian of such person.

(C) Notwithstanding subparagraphs (A) and (B), in the case of a person admitted to a program or facility for the purpose of receiving mental health services, no individual employed by or receiving any remuneration from such program or facility should act as such person's guardian or representative.

(Pub. L. 99–319, title II, §201, May 23, 1986, 100 Stat. 485; Pub. L. 102–173, §10(2), Nov. 27, 1991, 105 Stat. 1219.)

## EDITORIAL NOTES

### REFERENCES IN TEXT

The Mental Health Systems Act, referred to in introductory text, is Pub. L. 96–398, Oct. 7, 1980, 94 Stat. 1564, as amended. Title V of the Mental Health Systems Act is classified generally to subchapter IV (§9501 et seq.) of chapter 102 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 9401 of this title and Tables.

### AMENDMENTS

**1991**—Par. (1)(M)(iii). Pub. L. 102–173 substituted "individuals with mental illness" for "mentally ill individuals".

## SUBCHAPTER III—CONSTRUCTION

## §10851. Construction of subchapters I and II; "individual with mental illness" defined

(a) Subchapters I and II shall not be construed as establishing any new rights for individuals with mental illness.

(b) For purposes of this section, the term "individual with mental illness" has the same meaning as in section 10802(3)[1] of this title.

(Pub. L. 99–319, title III, §301, May 23, 1986, 100 Stat. 489; Pub. L. 102–173, §10, Nov. 27, 1991, 105 Stat. 1219.)

### EDITORIAL NOTES

#### REFERENCES IN TEXT

Section 10802(3) of this title, referred to in subsec. (b), was redesignated section 10802(4) of this title by Pub. L. 102–173, §4(1), Nov. 27, 1991, 105 Stat. 1217.

#### AMENDMENTS

**1991**—Pub. L. 102–173, substituted "individuals with mental illness" for "mentally ill individuals" in subsec. (a) and "individual with mental illness" for "mentally ill individual" in subsec. (b).

[1] See References in Text note below.

Exhibit # 8

Six-page's Exhibit's
A.D.A. Legal Rights

# INMATE PHOTO RELEASE FORM

Name:_____  #_____

Housing Unit:_____  Cell :_____

**Print neat and clear. If it cannot be read your form can not be processed.**

Photo Days &Time- Schedule at Facility discretion, Location-Gym

**RULES & PROCEDURES:**

Funds will be deducted from your account before photos are taken.

## NO FUNDS, NO PHOTOS, NO EXCEPTIONS

1) No tickets for the past 120 Days.
2) No more than one (1) inmate will be allowed in a picture. NO EXCEPTIONS
3) No posters, pictures, books, or any other periodical will be allowed in photo.
4) You must allow at least three to four weeks for processing.
5) You must allow at least one week for photos to be passed out after being taken.
6) No more than three (3) photos can be purchased at any given time.

This program is for the Inmate Population and in order for it to be a success your full cooperation is needed.

- Any disrespect towards staff or photo personnel will result in your suspension from the program
- In the event that you transfer and have already take a photo(s), contact the photo coordinator with the necessary information so the photo(s) can be forwarded to you.
- If you transfer prior to taking a photo but the money has already been deducted from your account, your money will be refunded by the previous facility.

CIRCLE ONE- Circle the number of photos and the amount requested to deduct:

1 photo -- $2.00        2 photos -- $4.00        3 photos -- $6.00

*Please deduct this amount from my inmate account and transfer it to the

CHESHIRE C.I. Special Activity Photo Fund

Inmate Signature:_____

Date:_____

Recreation Supervisor:_____

Date:_____

# KNOW YOUR RIGHTS
# LEGAL RIGHTS OF DISABLED PRISONERS

## ACLU National Prison Project

**Important Note:** The law is always evolving.  If you have access to a prison law library, it is a good idea to confirm that the cases and statutes cited below are still good law.  The date at the bottom of this page indicates when this information sheet was last updated.

### Statutes protecting disabled prisoners

Two major statutes exist to protect the rights of disabled prisoners: Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.[1]  In the prison and jail context, the Rehabilitation Act applies to facilities run by federal agencies (such as the Bureau of Prisons) and to any state or local agency that receives federal funding.[2]  The ADA regulates facilities run by state and local agencies, regardless of whether they receive federal funding.

Courts analyze claims under both the ADA and Rehabilitation Act in basically the same way.[3]  Also, the ADA, which is newer, should give disabled people at least as many rights as the earlier Rehabilitation Act.[4]  Thus, disabled prisoners may use cases about the Rehabilitation Act to help them interpret the ADA.

In 2008, in response to court decisions that narrowly interpreted the original text of the ADA, Congress passed the ADA Amendments Act of 2008.  The intent of the ADA Amendments Act of 2008 is to make courts focus on whether entities subject to the ADA have met their obligations to disabled people, rather than extensively analyzing whether a particular impairment is a disability.[5] Because of these amendments, many more disabled prisoners are entitled to protection than in prior years.

---

[1]  See Penn. Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998) (holding that the ADA "unmistakably includes State prisons and prisoners within its coverage").  See also 28 C.F.R. § 35.152 (ADA implementing regulations that apply specifically to adult and juvenile jails, detention, and correctional facilities).

[2]  Different regulations may apply depending on the source of the federal funding.  For example, state and local agencies that receive funding from the U.S. Department of Justice must comply with the Department of Justice's regulations, which are located at 28 C.F.R. § 42.501 et seq.

[3]  See, e.g., Frame v. City of Arlington, 657 F.3d 215, 223-224 (5th Cir. 2011) ("Although we focus primarily on Title II, our analysis is informed by the Rehabilitation Act, and our holding applies to both statutes").

[4]  Bragdon v. Abbott, 524 U.S. 624, 632 (1998), superseded by statute, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), as recognized in Miller v. McHugh, 814 F. Supp. 2d 299 (S.D.N.Y. 2011).

[5]  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, § 2(b) (2008).

1



*How do you define disability?*

The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.[6]

A "physical or mental impairment" could include hearing and vision problems, mental illness, physical disabilities, certain diseases, or many other conditions. "Major life activities" includes many private or public activities, such as seeing, hearing, sleeping, learning, reading, working, walking, various types of motion, or the operation of a major bodily function.[7]

When Congress amended the ADA in 2008, it instructed the courts to interpret the phrase "substantially limits" generously.[8] Thus, despite what earlier court cases may say, the ADA considers a wide range of impairments to be disabilities regardless of whether they can be helped or controlled by medication, prosthetics, mobility devices, therapy, or other mitigating measures.[9] Additionally, it does not matter if a particular impairment happens to be intermittent or in remission: if it "would substantially limit a major life activity when active," the impairment is still a disability under the ADA.[10]

Courts typically look at the facts of each lawsuit to decide if a person is disabled. Although most of the examples come from cases that were filed before the 2008 amendments to the ADA, these older cases still give guidance on how a court can do the analysis. In 1998, for example, the Supreme Court held that a person infected with HIV (human immunodeficiency virus, which is the virus that causes AIDS), may be disabled even if that person does not have any symptoms of the disease.[11] On the other hand, a person with multiple health conditions is disabled only if his ailments substantially limit participation in a major life activity.[12]

---

[6] 42 U.S.C. § 12102(1).

[7] 42 U.S.C. § 12102(2).

[8] See 42 U.S.C. § 12102(4).

[9] Id.

[10] Id.

[11] Bragdon, 524 U.S. at 641.

[12] Hale v. King, 642 F.3d 492 (5th Cir. 2011) (finding that, although the inmate suffered from multiple conditions such as PTSD and Hepatitis C, he was not disabled).

2

Last updated November 2012

**Enforcing your legal rights**
Title II of the ADA states:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[13]

To bring a lawsuit under the ADA and/or the Rehabilitation Act, disabled prisoners must show: (1) that they are disabled within the meaning of the statutes, (2) that they are "qualified" to participate in the program, and (3) that they are excluded from, are not allowed to benefit from, or have been subjected to discrimination in the program because of their disability.[14]  Under the Rehabilitation Act, prisoners must additionally show that the prison officials or the governmental agency named as defendants receive federal funding.[15]

Courts generally require factual evidence that shows a prisoner was qualified for a program and sought participation, but was denied entry based upon his or her actual or perceived disability.[16]  Disabled prisoners are "qualified" to participate in a program under the ADA and the Rehabilitation Act if they meet the program requirements.[17]

Disabled prisoners may bring a lawsuit seeking either injunctive relief (i.e., seeking a change in policies or practices) or money damages (i.e., money in compensation for being wronged). If seeking money damages, however, sovereign immunity becomes an issue. Under the Eleventh Amendment, state governments have sovereign immunity (i.e., immunity from being sued by their own citizens) from many kinds of lawsuits.[18]

---

[13] 42 U.S.C. § 12132.

[14] 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

[15] 29 U.S.C. § 794(a).

[16] See, e.g., Lue v. Moore, 43 F.3d 1203, 1205-1206 (8th Cir. 1994) (blind inmate denied access to vocational training programs may bring claim for damages and affirmative relief under Rehabilitation Act, but denying relief because inmate failed to prove he had applied to programs or requested accommodations).

[17] Under the ADA, a "qualified individual with a disability" means a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  The definition under the Rehabilitation Act is slightly different. See Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979) (holding that under the Rehabilitation Act, "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap").

[18] Nevada Dep't of Human Resources, 538 U.S. 721, 726 (2003); College Sav. Bank v. Florida Prepaid Postsecondary Expense Bd., 527 U.S. 666, 675 (1999).

3



The sovereign immunity defense is not available for claims under the Rehabilitation Act, because the state's acceptance of federal funds waives their sovereign immunity.[19] Since almost all state and local corrections departments and Sheriff's offices receive some form of federal funding, disabled prisoners may seek money damages against them under a Rehabilitation Act claim.

The situation is more complicated for claims brought under the ADA. Sovereign immunity is not a defense to an ADA case that seeks purely injunctive relief.[20] Additionally, the Supreme Court held in 2006 that sovereign immunity is not a defense to an ADA damages claim based on unconstitutional conduct.[21] In the prison context, this means that a disabled prisoner who is incarcerated in a state prison may sue the state for monetary damages under the ADA based on conduct that independently violates the Eighth Amendment's prohibition against cruel and unusual punishment. What remains an unsettled question is whether disabled prisoners can seek damages for conduct that violates the ADA, but does not violate the Constitution.[22]

## Which rights can be enforced?

Disabled prisoners have sued to get *equal access to facilities, programs and services*. For example, inmates and arrestees have sued to be able to use prison showers and toilets and to be protected from injury or the risk of injury.[23] Deaf and hearing-impaired prisoners have won cases to get sign language interpreters for disciplinary hearings, classification decisions, HIV-AIDS counseling, and educational and vocational programs.[24]



---

[19] See, e.g., Phiffer v. Columbia River Correctional Institute, 384 F.3d 791 (9th Cir. 2004); Garrett v. University of Ala. at Birmingham Bd. of Trustees, 344 F.3d 1288, 1293 (11th Cir. 2003).

[20] Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n.9 (2001).

[21] United States v. Georgia, 546 U.S. 151, 155-160 (2006).

[22] See id. at 882. The Supreme Court has stated that, for conduct that violates the ADA but not the Constitution, lower courts must decide whether Title II nonetheless still validly abrogates sovereign immunity. The lower courts who have so far ruled on this issue have found Title II to validly abrogate sovereign immunity for claims by disabled students in public education. See, e.g., Goonewardena v. New York, 475 F. Supp. 2d 310, 326 (S.D.N.Y. 2007); Toledo v. Sanchez, 454 F.3d 24, 40 (1st Cir. 2006). However, all lower courts that have so far addressed the issue in the context of state prisons have held that a Title II damages claim does not validly abrogate sovereign immunity unless it is also based upon a constitutional violation. See Hale v. Mississippi, 2007 WL 3357562, at *8 (S.D. Miss. 2007); Chase v. Baskerville, 508 F. Supp. 2d 492, 503-04 (E.D. Va. 2007).

[23] See Pierce v. County of Orange, 526 F.3d 1190, 1218-1220 (9th Cir. 2008); Gorman v. Easley, 257 F.3d 738 (8th Cir. 2001) (injury during transportation by police in vehicle without wheelchair restraints), rev'd on other grounds, Barnes v. Gorman, 536 US 181 (2002); Shariff v. Coombe, 655 F. Supp. 2d 274, 298-99 (S.D.N.Y. 2009) (inability of wheelchair-bound prisoners to access restrooms amounted to Eighth Amendment violation); Kaufman v. Carter, 952 F.Supp. 520, 523-24 (W.D. Mich. 1996) (failure to provide access to bathrooms and showers).

[24] Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988); Duffy v. Riveland, 98 F.3d 447 (9th Cir. 1996); Clarkson v. Coughlin, 898 F.Supp. 1019, 1027-32 (S.D.N.Y. 1995).

4

Disabled prisoners have challenged *inadequate medical care* and prison officials' failure to provide them with medical supplies or devices such as wheelchairs or canes.[25]  These cases may combine ADA claims with arguments that prison officials have violated the Eighth Amendment of the U.S. Constitution by being deliberately indifferent to prisoners' serious medical needs.[26]

Disabled prisoners have challenged their *confinement in isolation and segregation units under the ADA and the Rehabilitation Act.*[27]  In one case, for example, the Seventh Circuit ruled that prison officials discriminated against a quadriplegic prisoner in Indiana who was housed in an infirmary unit for over one year and was thereby denied access to the dining hall, recreation area, visiting, church, work, transitional programs and the library.[28]

*Re. Placement in inappropriate housing / Classification etc see*

Additionally, the U.S. Department of Justice issued prison and jail-specific ADA regulations in 2010.  28 C.F.R. § 35.152.  These regulations require prisons and jails to, *of* as a general rule, place disabled prisoners in the most integrated setting appropriate to their needs. This means that it is usually inappropriate to put disabled prisoners in inappropriate security classifications due to a lack of accessible cells or beds, place disabled prisoners in infirmary units if they are not actually receiving medical care or treatment, place disabled prisoners in facilities that do not offer the same programs as other facilities where they would otherwise be housed, or deprive disabled prisoners of family visits by placing them in distant facilities where they would not otherwise be housed.  28 C.F.R. § 35.152(b)(2).

**Limitations on these rights**
Prison officials are not required to provide accommodations that impose "undue financial and administrative burdens" or require "a fundamental alteration in the nature of [the] program."[29]  Prison officials are also allowed to discriminate if the disabled prisoners' participation would pose "significant health and safety risks" or a "direct threat" to others.[30]  Finally, some courts have said that prison officials can discriminate against

---

[25] Saunders v. Horn, 960 F. Supp. 893 (E.D. Pa. 1997) (failure to provide orthopedic shoes and cane); Herndon v. Johnson, 970 F.Supp. 703 (E.D. Ark. 1997).

[26] See, e.g., Kaufman, 952 F.Supp. 520.

[27] Carty v. Farrelly, 957 F.Supp. 727, 741 (D.V.I. 1997) (prison officials violated ADA by housing inmate not suffering from mental illness with mentally ill prisoners because his cane was considered security threat).

[28] See Love v. Westville Correctional Center, 103 F.3d 558 (7th Cir. 1996).

[29] Southeastern Community College, 442 U.S. at 406.

[30] School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 (1987) (holding that a person who poses a significant risk to others is not "otherwise qualified" for the activity, establishing a four-part test for determining whether contagious disease constitutes such a risk); 42 U.S.C. § 12182(b)(3).

5

disabled prisoners as long as the discriminatory policies serve "legitimate penological interests."[31]

**Alternatives to the ADA and Rehabilitation Act**

Depending on the situation, disabled prisoners may file claims for relief based on the United States Constitution either in addition to, or instead of, ADA and Rehabilitation Act claims.  The Eighth Amendment prohibits any form of cruel or unusual punishment. For example, federal or state prison officials violate the Eighth Amendment when staff members are deliberately indifferent to the serious medical needs of prisoners, including the special requirements of disabled inmates.[32]

The Fifth and Fourteenth Amendments prohibit government officials from depriving persons of life, liberty or property without "due process" of law, and the Fourteenth Amendment requires that all citizens receive the "equal protection" of the law.[33]  Thus, prison officials may violate the Constitution if they discriminate against disabled inmates on the basis of their disabilities.[34]  However, to win an equal protection claim, disabled persons must prove that there is no legitimate government reason for the discriminatory policy.[35]  This is a very difficult standard for prisoners to meet because courts generally give prison officials wide discretion in administering correctional facilities.[36]

---

[31] Gates v. Rowland, 39 F.3d 1439, 1446-47 (9th Cir.1994) (upholding discriminatory policy on security grounds based on unsubstantiated fears of other prisoners); cf. Yeskey v. Penn. Dep't of Corrections, 118 F.3d 168, 174-75 (3rd Cir. 1997) (holding that prison management decisions that may violate a state prisoner's rights are subject to a "reasonableness" test).

[32] Estelle v. Gamble, 429 U.S. 97 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment); see, e.g., Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999) (prison officials violated Eighth Amendment by providing such inadequate medical treatment for inmate's diabetes and hypertension that inmate consequently suffered heart attack); LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities); Madrid v. Gomez, 889 F. Supp. 1146, 1265-66 (N.D. Ca. 1995) (continued confinement of mentally ill inmates in the facility's security housing unit violated the Eighth Amendment); Felix-Torres v. Graham, 521 F. Supp. 2d 157 (N.D.N.Y. 2007) (prison officials violated Eighth Amendment by failing to assign inmate suffering from diabetic seizures to bottom bunk).

[33] The Fourteenth Amendment governs actions by state governments and the Fifth Amendment governs actions by the federal government.

[34] See, e.g., Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991) (federal inmate could not bring employment discrimination claim under Rehabilitation Act but could do so under Fifth Amendment, because "prison officials cannot discriminate against him on the basis of his age, race, or handicap…").

[35] Whitington v. Moschetti, 423 F. App'x 767, 770 (10th Cir. 2011); Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia, 6 F.3d 990, 1001 (3rd Cir.1993).

[36] Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"). *This is what has to be combatted !*

6